July 2, 1982

In the Matter of Practice of:
William P. BATTLES in the Window Rock
Judicial District

Michael Stuff, Esq., Flagstaff, Arizona, for appellant and Benjamin
Curley, Esq., Window Rock, Navajo Nation (Arizona) for appellee, and
Michael C. Nelson, Esq., Attorney for the Navajo Nation Bar Association,
Window Rock, Navajo Nation (Arizona)

I. MAJORITY OPINION

 This is an important case because it calls upon the Court of
Appeals to examine and define the authority of the Navajo judges in
allowing individuals to practice law before them.
 The case began with a petition of the Navajo Nation to extradite
Richard L. Begay to the State of Arizona for the purpose of prose-
cution for an alleged offense. Mr. Begay appeared through his counsel,
William P. Battles, and the prosecutor, Raymond Tso, moved to disqua-
lify Battles from acting as counsel for Mr. Begay on the ground non-
Indian "nonprofessionals" cannot appear as attorneys in the Courts of
the Navajo Nation. The motion also claimed that since Mr. Battles is
Anglo and not a member of the State Bar of Arizona, he is barred from
practicing law anywhere within the state.
 Following briefing, the Hon. Tom Tso rendered a written opinion
and order barring Mr. Battles from practicing law in the Window Rock
and Ramah Court districts. The scholarly opinion is reported at (1982)
Navajo L.J. 2000.
 Judge Tso's opinion sets out the essential facts of this case very
well. Id. 2001. Battles is not an enrolled member of the Navajo Tribe
and he is not admitted to practice law in any state of the United States
or any Federal court of the United States. He is not a law school
graduate. Notwithstanding those facts, Battles passed the examination
for admission to the Navajo Bar and he has in fact been practicing law
within the territorial jurisdiction of the Navajo Nation under color of a
lawful admission to practice before our courts. In the course of his law
practice in this jurisdiction Battles represents both members of the
Navajo Tribe and non-Navajo individuals before our courts.
 Our opinion must also note that Mr. Battles is a rather contro-
versial figure. He passed the first bar examination administered by the
Navajo Courts, along with 79 other individuals. Arizona Republic,
December 11, 1976. The following year Battles filed a $12.2 million law
suit in our courts against Raymond Tso, the prosecutor in this case.

-92-

Gallup Independent, June 13, 1977. Later participation in controversial suits, proceedings and disputes has made Battles a figure disliked by some, but neither the decisions of the District Court nor this court are based upon Mr. Battles' notoriety. The prosecutor raised a very important legal point which had to be addressed by the District Court, and the Hon. Tom Tso's opinion addressed that point seriously and well.

Judge Tso focused upon the central issue which is before us here: "Whether non-Navajos who are not professional attorneys may practice law in Navajo Tribal Courts?" (1982) Navajo L.J. at 2001.

The trial court's analysis of the issue was founded upon two statues - 7 NTC Secs. 601 and 606. 7 NTC Sec. 601(a) provides, in pertinent part:

"A majority of the judges of the Trial Court of the Navajo Tribe may adopt rules of pleading, practice, and procedure applicable to any or all proceedings in the Trial Court and the Court of Appeals of the Navajo Tribe."

7 NTC Sec. 606 provides:

"Professional attorneys shall not appear in any proceedings before the Court of the Navajo Tribe unless rules of court have been adopted as set forth in 7 NTC Sec. 601 prescribing conditions governing their admission and practice before the court. Every defendant shall have the right to have some member of the Tribe represent him and in the event he has no such representation, a representative may be appointed by the judge. The judge may appoint a member of the Tribe as prosecutor."

The trial court's analysis of the effect of these statutes on the issue posed began with the principle that the Navajo Tribal Council created the Navajo Court system and fixed the scope of power of the courts. (1982) Navajo L.J. at 2003. The court then read the two statutes together and concluded that the intent of the Navajo Tribal Council was to limit practice to professional attorneys and members of the Navajo Tribe. Id., 2004. The court concluded that these limitaions were reasonable and they were made to strengthen Navajo sovereignty in the fact of possible state takeover, and sovereignty was protected by the fact members of the tribe would understand Navajo custom and tradition and non-member professionals would have the skills necessary to learn those Navajo laws and customs. Id., 2004. It was assumed that non-Navajo non-professionals (i.e. professionals in the field of law) would not know Navajo customs and traditions or know how to learn them. Id., 2004-2005.

The trial court found that a transcript of the proceedings of the Navajo Tribal Council of October 27, 1958 showed the Council meant the words "professional attorney" to mean a graduate of an accredited law school who was admitted to practice in state and Federal courts. Id. 2005.

Based upon these interpretations of the statutes and the intent of the Council, the Trial Court found that Mr. Battles had been erroneously granted the privilege of practicing law in the Courts of the Navajo Nation, and it barred him from appearing before the Window

Rock District Court, the Ramah District Court (which was then under the jurisdiction of Judge Tso) or practicing law within the confines of either of those two judicial districts. Id. 2006.

On appeal this court was very concerned that the important questions before it be fully presented and that all interested parties be provided with an opportunity to make presentations to the court. Therefore the Acting Chief Justice permitted the filing of friend of the court briefs and asked that certain questions be addressed. In addition the court took the unusual step of permitting not only the parties but those who filed friend of the court briefs to participate in oral argument.

The appeal arguments of Mr Battles were essentially simple, and they claimed (1) the trial court had abdicated Navajo judicial functions to the state, (2) the trial court's opinion was essentially an exercise of judicial rulemaking powers in violation of 7 NTC Sec. 601, and (3) Mr. Battles fell within the "professonal attorney" standards of the statute in question.

The law firm of Ruzow & Sloan filed a scholarly brief, asserting the arguments that only two classes of individuals (professional attorneys and Navajo) are authorized to be members of our bar and that there are good policy reasons for limiting membership to those categories.

Unfortunately the Office of the Prosecutor chose not to file a brief in this case, choosing instead to rely upon the Ruzow & Sloan brief. This is an unusual position, especially in light of the facts Mr. Tso chose to bring the motion for disqualification that began this case and the Office of the Prosecutor represents the interests of the Navajo Nation.

The Navajo Nation Bar Association demonstrated its usual active and responsible participation in matters of court policy by filing an extensive and persuasive brief on the issues which fairly arise from this case. The bar association argued in favor of the Courts exercising sole authority over matters of bar membership, pointing out that the Navajo Tribal Council followed the general American law that it is the courts which are the better bodies to decide bar membership. The bar association also pointed out that should the District Court decision be upheld, approximately 16 of the 230 Navajo Nation Bar Association members would be stripped of membership in the bar.

Based upon these facts, factors and arguments, this court will address three areas of law which must be discussed in order to resolve this case. They are:

1. What was the intent of the Navajo Tribal Council regarding bar membership when the present judicial code was adopted?

2. What is the authority of the Navajo Courts in regulating the practice of law?

3. What is the effect of the passage of time between Mr. Battles' admission to the bar and his present situation, and what is the effect of the prior practice of admitting "nonprofessional, non-Navajo" individuals to the bar?

1. THE INTENT OF THE NAVAJO TRIBAL COUNCIL

7 NTC Sec. 606 prohibits the appearance of professional attorneys in our courts without a court rule so permitting, and it gives a defendant the right to have a member of the Navajo Tribe represent him. The only thing that is prohibited by the statute is the appearance of profes-

sional attorneys, and the only thing required by the statute is that a Navajo be permitted to represent a fellow Navajo defendant. It is quite obvious that the question of membership qualifications for an organized bar was not considered by the Council.

The discussion of the question of bar membership as such by the Council was limited, and it focused only upon permitting professional attorneys to appear. Minutes of the Navajo Tribal Council ("NTC Minutes"), October 17, 1958, pp. 334-335. In response to a question of a councilman as to whether a party could bring in "outside counsel," Attorney Laurence Davis replied that such a party could not and Davis interpreted the proposed section this way:

> "The meaning of that is that the Court can by rule provide for the use of professional attorneys but unless this Court, this new Court, makes such a rule, professional attorneys will continue to be barred from Courts. I feel that in the ordinary case in the Navajo Courts professional attorneys should not be permitted to practice for the reason that if you let professional attorneys in, the party before the Court who has money and can pay will have a great advantage over the poor man who can't. Id. at 335.

The debate over "professional attorneys" spilled over into 1959 proceedings of the Council. One legal scholar summed up the controversy as of June, 1959 this way:

> "Members of the Tribal Council asked again that attorneys be provided to assure protection of parties in court. The tribal attorneys did not support the introduction of lawyers into tribal court. The reforms left the judge in a pivotal position to assess the traditional or modern outlook of the Navajo party before the judge. Lawyers would add confusion with technical rules of evidence and procedure that neither judges nor parties understood." Stephen Conn, "Mid-Passage - The Navajo Tribe and Its First Legal Revolution," 6 American Indian L. Rev. 329, 365.

Judge Tso was correct - the Navajo Tribal Council was afraid of state jurisdiction and a state takeover, and it did wish to reinforce Navajo sovereignty. See Id., esp. pp. 354-365. The new court system was created to avoid the systems of others, and a legal system designed on state and federal models was the result. Id. at 338. While we agree with Judge Tso as to the motivation for the adoption of 7 NTC Sec. 606., It is clear that the tribal attorneys advising the Council wanted "professional attorneys" kept out of the courts pending the adoption of rules to meet changed circumstances, and that the Council wished to provide for Navajo defenders in the meantime. The thrust of the Council's action was to keep legal representatives out of the courts in general pending the adoption of court rules, and we conclude that the statute is not one of limitation on the power of the courts to set bar standards but one to give regulatory authority to the courts and as well as guarantee the right of a defendant to have someone "speak" for him.

Legislative history does not support an interpretation of the statute to disqualify individuals who are not Navajo and who are not law

school graduates. The excellent Ruzow & Sloan brief attempts to support the District Court's strict interpretation of the staute, but it fails to adequately grapple with the fact that a strict interpretation would keep Navajo from representing plaintiffs. You simply cannot urge a strict construction of this statute to uphold general representation by non-law school graduates. A strict construction cuts both ways, and since the law forbids absurd results when reading statutes, the argument fails.

Again, what did the Council intend? This is apparent when reading 7 NTC Sec. 606 with 7 NTC Sec. 601. Using the general rule that one reads laws by reading the laws which cover the same subject together, the answer appears more clearly.

On October 17, 1958 Attorney Laurence Davis explained the statute which is now codified as 7 NTC Sec. 601 - the power of the courts to make rules of pleading, practice and procedure - as follows:

> "The Federal Law at the present time provides that the Supreme Court may adopt rules governing the practice in Federal Courts; in Arizona the Supreme Court of the State makes the rules of practice for the Courts. The system of having the rules of practice adopted by the Court rather than the Legislature has proved very satisfactory wherever it has been tried because it allows the Court to tailor the rules to the actual problem coming up, and it allows the judge who are actually working in court to say what the problems are and what rules of practice they need to solve their actual day-to-day problems." NTC Minutes, Oct. 17, 1958, p. 342.

The word "practice" is broad - it certainly encompasses all matters before the court, and it most particularly includes the "practice" of law. The legislative history of Sec. 601 makes it clear the Navajo Tribal Council intended that we have all necessary rulemaking powers and regulatory authority, as do the state and federal courts, and that includes the regulation of the practice of law.

A very similar legal question to the one here came before this court in the case In the Matter of Bowman. 2 Navajo R. 27 (1979). There a Navajo law school graduate applied for admission to the bar without taking the bar examination, and this court noted that the judges had adopted a rule under the authority of Sec. 601 requiring a bar examination. The court noted that the rule requiring a bar examination "was meant to apply to Navajo and non-Navajo alike, professional attorney and non-professional attorney." Id. at 28. In other words, in the matter of practitioner qualifications the court will rely upon the general rulemaking authority given to it by the Council, and it will not abdicate that authority.

We conclude the discussion of the application of the rulemaking and attorney statutes by holding that those statutes have given the Courts of the Navajo Nation the full and sole authority to regulate the practice of law within the Navajo Nation, without limitation.

2. GENERAL AUTHORITY OF THE NAVAJO COURT TO REGULATE THE PRACTICE OF LAW

As was noted in the previous section, the Navajo Tribal Council

intended that the Navajo Courts have all those powers and all the authority held by state and federal courts. What are those powers and what is that authority when applied to the regulation of law practice?

Since American legal practices are built on English usages, we look back in history and see that it was always the courts and not the legislatures who admitted individuals to practice as attorneys. III Blackstone, Commentaries on the Laws of England 26; See also Serjeant Pulling, The Order of the Coif pp. 203 - 204 (1884). This tradition and legal doctrine has been continued, and the jurisdictions of Arizona and New Mexico follow these rules:

In Arizona the ultimate responsibility for the admission of persons to the practice of law is in the Supreme Court. Application of Levine, 397 P.2d 205, 207 (Arizona 1965). In that state, it is the courts which have inherent power to determine who may be admitted to the bar. Application of Heaney, 476 P.2d 846 (Arizona 1970).

In New Mexico the rule is that it is the court which has the ultimate responsibility to grant or withhold the right to practice law. Rask v. Board of Bar Examiners, 409 P.2d 256, 261 (N.M. 1966); State ex rel. Norvell v. Credit Bur. of Albquerque, 514 P.2d 40, 44-45 (N.M. 1973).

Since specific legislative reference was made to the law of a neighboring jurisdiction, then its rule of law that it is the courts that set the qualifications to practice law is the rule applicable in this jurisdiction.

## 3. THE PASSAGE OF TIME AND THE USAGE PROBLEM

Mr. Battles passed the first Navajo bar examination in 1976 and he was a member of the bar approximately five years when his membership status was challenged. After Mr. Battles' admission to the bar, in October of 1978 the Judges of the Navajo Nation created an integrated bar, approved the articles of association and bylaws of the Navajo Nation Bar Association and granted the bar association the authority to establish standards for admission to the bar and administer a bar examination.

7 NTC Sec. 606 was enacted in 1959. 17 years later Mr. Battles was admitted to practice, 19 years later the Judges gave the right to the bar association to admit non-Indian non-law school graduate members, and it was not until 22 years after the statute was passed that the first challenge was raised to the prior practice.

Conditions and history changed greatly in those years, and the initial wisdom of the Navajo Tribal Council in giving the courts the authority to frame their own court policies is now apparent.

While this court will at all times protect the interests of the public and the right of the public to competent legal practitioners, and we will not hesitate to overturn a longstanding practice which is against the law, it should be noted that the long passage of time between the enactment of the statute and the consistent interpretation and practice of this court in admitting non-Indian non-law school graduates to practice not only reinforces our opinion but it is another factor in reversing the decision of the District Court.

The judgment of the Window Rock District is therefore REVERSED.

## II. SPECIAL CONCURRING OPINION BY ASSOCIATE JUSTICE MARIE F. NESWOOD

I am bothered by the passage of time in this case. If 7 NTC Sec. 606 barred people like Mr. Battles, why was that objection not brought up before 1981? Where were the objectors in 1976? The court had in-house counsel at that time, and he administered the first bar examination, permitting Mr. Battles to take it. The Navajo Nation Bar Association very carefully drafted its articles, bylaws and the admission rules we are using today and it submitted them to the judges in 1978. We must assume that the attorneys, judges and the founders of the bar association knew what they were doing. Where were the objectors then?

Our admission qualifications have been examined a number of times, and the objection raised here was never brought up. I think the majority opinion of this court is correct, and I particularly think it only follows that many years of consistent practice should be upheld absent a clear statute which requires a different conclusion.

The law has a doctrine that where a right has been allowed to exist for a long period of time, and people rely upon the existence of such a right, no one should be allowed to come along later and say the right existed improperly. In other words, if someone has something and uses it in good faith, someone else should not be allowed to come along and take it away. In law we call this idea laches or estoppel.

Applying the idea to this case, the approximately 16 non-Navajo who are not law school graduates and who are members of our bar should not have their privilege of practicing law taken from them except upon the clearest showing it is illegal for them to be bar members. It has been assumed for these many years they could be members of the Navajo bar, and I am not satisfied there has been any clear or even satisfactory showing they are not eligible to be officers of the court. I therefore agree with the majority opinion.

## III. SPECIAL CONCURRING OPINION BY ASSOCIATE JUSTICE ROBERT B. WALTERS

I was particularly bothered by the conflicts which would be created by a strict and literal reading of 7 NTC Sec. 606. It is true that the Navajo Tribal Council of 1958 was bothered by the threat of state takeover, and it noted in paragraph (2) of the preamble to Resolution CO-69-58 that:

> ". . . the legal staff is of the opinion that a comprehensive and complete reform of the court system on the Reservation is not fully attainable at the present time due to the lack of Navajo Indians trained in the law, but that very great improvements can be made in the administration of justice and must in fact be made, if the extension of state criminal and civil jurisdiction is to be avoided."

Beginning with that clear indication of the Council's thinking, there are two approaches to the statute. The District Court took the strict approach and said, in effect, "Since the Council barred professional attorneys pending the passage of a court rule, it only intended that

professional attorneys be admitted to the bar." That might be a fair reading of the statute if it were to stop there. However 7 NTC Sec. 606 goes on to give the right for a member of the Tribe to represent any defendant. If we are to continue the literal reading of the statute, then only outside, non-Navajo "professional" attorneys could represent plaintiffs before us upon the passage of a court rule.

If we were to adopt the reasoning that the court should extend the statute to permit general representation by Navajo practitioners, and not limit it to defense, then we would be setting a precedent for claims of others to practice by some sort of extension theory. They would say, "If you let them in for this reason by saying the statute should cover their situation, then you have to let us in for another reason, because we should be able to take advantage of the court making extensions." We cannot have that.

Chief Justice John Marshall once countered arguments that the United States Constitution should be frozen to the interpretations of the men who wrote it. He said, "This is a Constitution we are interpreting." The Founding Fathers of the United States wrote a document which was flexible and which fit the situations that would happen in the future. The Founding Fathers of the Navajo Courts had equal wisdom, and they intended that the Court charter, which is presently enshrined in Title 7 of the Navajo Tribal Code, be flexible to fit the future. Therefore we must not be hampered by supposed restrictions which are not clear in a statute which was not intended to limit our proper actions. Reading Title 7 as a document which is alive and which gives us guidance, I say that the Council intended that we fully regulate the practice of law, and that we must do so. This is important obligation, and we, the judges, will design bar qualification rules to protect the Navajo People.

The interpretation which was urged upon us in support of the ruling of the District Court is not logical and is not a fair reading of the statutes, as highlighted by the entire judicial code.

I therefore agree with the reasoning of the majority opinion.

## IV. DISSENT BY ACTING CHIEF JUSTICE HOMER BLUEHOUSE

I must respectfully dissent from the majority opinion in this case.

While debating the ruling of the court in this case, I was reminded of the tragic situation in the former Joint Use Area. The Navajo and the Hopi Peoples did not wish to have a fight about land rights, and these two old neighbors wanted to maintain their historic friendship. The Navajo and the Hopi have ties of clan, family, friendship, trade and common religious beliefs, and had the problem of sharing the land been left to the traditional leaders of these two peaceful Peoples, the problem would have been solved. At the time the Navajo and Hopi Peoples were attempting to come to friendly understandings, the lawyers for the Hopi and the lawyers for the Navajo forced the tribes to settle their problem in the White Man's way - litigation. The Congress and the Courts of the United States forced an alien way of resolving the dispute upon the Navajo and the Hopi, and the result is the actual death of families by the imposition of a force from outside the Navajo and Hopi Peoples. This is wrong, and it is violative of all basic concepts of decency. It is certainly violative of international law.

How does the tragedy of the Navajo-Hopi forced resettlement tie into the question before this court? It is very simply this - I believe

that the Navajo Tribal Council recognized that we, the Navajo, must not allow our traditions and our culture to be destroyed. The Council faced the possibility of an invasion from the states which claim their territories are co-existent with ours, and it felt that there might need to be some concession to the outside in order to avoid extermination. Therefore the Council made it possible for foreign attorneys to appear before us should it be necessary to avoid a takeover. It did not intend that anyone else from the outside be permitted to appear before us. The Council wanted problems taken care of by the Navajo People in their own ways, with as little outside intervention as possible. We have seen what happens when outside intervention is tolerated - we see the tragedy of the former Joint Use Area which is legally called genocide.

I therefore cannot join the majority and dissent, adopting the opinion of Judge Tso.

## V. CONCLUSION

(Joined in by the entire Court)

Although we do not all agree upon the conclusion in this case, and we do not all completely agree as to the intent of the Navajo Tribal Council in the area of attorney qualifications, we do agree on some questions.

First of all, as to some of the questions raised on appeal, we find that the Hon. Tom Tso did not abdicate Navajo judicial functions to the State of Arizona. Judge Tso's ruling was based strictly upon Navajo law, using a fair method of interpretation, and the argument that Mr. Battles is not licensed to practice law in Arizona was not used as a basis for the District Court ruling. This was proper, since Arizona's opinion on the matter is completely inapplicable. Mr. Battles is not a "professional attorney" within the meaning of the statute. Some of the arguments before the court on the meaning of these words used circular reasoning, saying that since one who becomes a member of our bar is legally a "professional attorney," the meaning of the statute is satisfied. Judge Tso's interpretation of the rule was correct, and the Council did mean to include only members of the bars of states or United States within the definition. Our bar members are "professional attorneys" since we license and regulate them in the practice of law. However that is a separate definition than the one contained in the statute. Finally, Judge Tso did not usurp the rulemaking functions of the Navajo judges. The question was presented to the District Court of a possible conflict between a rule of court and a statute. That is a conflict a judge must rule upon. While normally a Trial Judge should be cautious in determining a court rule passed by a majority of the Trial Judges to be invalid, and such determinations should finally be left to the Court of Appeals, the Trial Judge should consider and rule upon any serious question presented concerning the validity of a rule.

Secondly, While we may disagree as to the scope of authority of the judges in fixing practice qualifications, we agree that it is the responsibility of the judges to make rules for the operation of the courts. This includes practice qualifications, and the responsibility to set them is solely that of the judges, and they cannot give that responsibility away. This does not mean that there cannot be an integrated bar or a healthy partnership with the Navajo Nation Bar

Association. It also does not mean that the bar association may not voice its opinions on bar qualifications. It simply means that whatever qualifications are fixed can only be fixed by the approval of a majority of the Trial Judges of the Navajo Nation in complaince with 7 NTC Sec. 601(a). The Court of Appeals therefore urges the Trial Judges, sitting as the Navajo Judicial Conference under the statute, to review the question of bar membership and to make a statement of policy upon it.